**Kary BRINSON, Plaintiff–Appellant,**

v.

**LINDA ROSE JOINT VENTURE; Simonson Enterprises III, Inc.; Thornton VI, Inc.; F/T Linda Rose, Official Number 633219, her engines, tackle, equipment, appurtenances, freights, and cargo, in Rem, Defendants–Appellees.**

No. 93–36067.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1994.

Decided May 1, 1995.

Bradley H. Bagshaw, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, WA, for plaintiff-appellant.

Lynne M. Cohee, Louis D. Peterson, Hillis, Clark, Martin & Peterson, Seattle, WA, for defendants-appellees.

Before: BEEZER and FERNANDEZ, Circuit Judges, and ORRICK,[*] Senior District Judge.

ORRICK, District Judge:

Appellant, Kary Brinson ("Brinson"), a cook aboard the factory trawler *Linda Rose* ("Vessel"), appeals a summary judgment in favor of Linda Rose Joint Venture, Simonson Enterprises III, Inc., Thornton VI, Inc., and the Vessel[1] (collectively "appellees"), involving her contract of employment ("Contract") as a crew member of the Vessel with Golden Age Fisheries ("Golden Age"), a company owned and controlled by Simonson Enterprises III, Inc., which manages the fisheries business controlling the *Linda Rose.* We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.

**I.**

The gravamen of the action brought by Brinson against the appellees is an alleged breach of contract[2] by Golden Age and appellees, alleging she was not paid the full amount of the compensation set forth in the Contract. Brinson understood she would be paid a guaranteed daily wage with a potential for a bonus, based on a share of the Vessel's catch. Brinson alleges that appellees, acting through Golden Age, failed to estimate the value of the catch in good faith and improperly deducted from the bonus portion of her pay a share of a commission payable to their in-house management company. Most of the fish product of the *Linda Rose* was sold in Japan through a "Marketing and Sales Agreement" ("Marketing Agreement") between Golden Age and a commission sales broker, Kyokuyo Co., Ltd. ("Kyokuyo").

The Contract specifies that the bonus will be calculated according to a "Bonus Compensation Formula," which stipulates that Brinson's bonus is equal to a share of the Vessel's "Adjusted Product Value," less her base compensation. By the terms of the Contract, the "Adjusted Product Value" is equal to the owner's estimate of the sales price of the catch minus the owner's estimate of the following expenses: packaging, product additives, food and galley supplies, storage and handling, freight, *sales commission*, insurance, import expenses, and technical advisor.

The first step in this calculation was to use Kyokuyo's preliminary estimate of the sales price, which was expressed in yen and deduct from it the expenses (in yen) that were listed in the Contract and in the Marketing Agreement, including a 5.46 percent sales commission for Kyokuyo. Then, Golden Age deducted a 5 percent "commission" for itself and converted the resultant "Adjusted Product Value" from yen to dollars. When making this conversion, however, Golden Age did not use the current exchange rate. Instead it used a rate contained in foreign exchange forward contracts it periodically bought. Appellees claim that Golden Age purchased these contracts to hedge against potential losses due to foreign exchange fluctuations. Brinson objects to Golden Age's practice of

---

[*] Honorable William H. Orrick, Senior United States District Judge for the Northern District of California, sitting by designation.

1. Simonson Enterprises III, Inc. and Thornton VI, Inc. are Washington corporations engaged in the fisheries business. Linda Rose Joint Venture is comprised of the two corporations.

2. The complaint also alleges underpayment of wages and wilful deprivation of wages, and seeks an accounting.

passing this rate hedge onto its employees. During the five trips of the *Linda Rose* on which Brinson worked, the actual exchange rate was between 3 and 9 yen lower than the rate used by Golden Age. Brinson estimates that this difference resulted in an approximate 5 percent loss of wages. The additional 5 percent "commission" taken by Golden Age combined with the different exchange rate allegedly deprived Brinson of approximately 10 percent of her wages. Appellees assert that the exchange rate used in arriving at the estimate of product value thus reflects the rate actually paid by Golden Age, rather than an artificial spot market rate figured at some arbitrary point in time. They agree with Brinson that the bonus compensation was calculated based on the "Adjusted Product Value," which was the estimated sales price less certain expenses, including a "sales commission." The Contract, however, also included the following language in all capital letters:

> OWNER MAY ESTIMATE THE SALES PRICE AND EXPENSES FOR THE PRODUCTS BY WHATEVER METHOD IT SHALL SELECT IN ITS SOLE DISCRETION INCLUDING BUT NOT LIMITED TO REVIEW OF HISTORICAL SALES PRICES, PROJECTED MARKET CONDITIONS AND/OR ACTUAL SALES CONTRACTS. CREWMEMBER EXPRESSLY RECOGNIZES AND ACKNOWLEDGES THAT THE ESTIMATED SALES PRICE AND EXPENSES WILL *NEVER* BE IDENTICAL TO THE ACTUAL SALES PRICE AND EXPENSES, AND THAT THE ACTUAL SALES PRICE AND ACTUAL EXPENSES MAY DIFFER SUBSTANTIALLY FROM THE ESTIMATES.

(E.R. 19.).

Appellees do not dispute that they engage in either of the sales practices to which appellant objects. Instead, they argue that these are legitimate business practices that fall within the boundaries of both the Contract and the law.

With respect to the 5 percent sales commission taken by Golden Age as one of the owner's expenses under the Contract, appellees claim that it is a legitimate commission, and although Kyokuyo acts as broker for the sales of the Vessel's fish product to Japan, Golden Age, which plays a large supporting role in this sales effort, is accordingly compensated for its services.[3]

## II.

### A.

■ In reviewing a grant of summary judgment, the task of the appellate court is identical to that of the trial court. *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1487 (9th Cir. 1983). Viewing the evidence in the light most favorable to the party against whom summary judgment is granted, the court of appeals must determine *de novo* whether there was a genuine issue of material fact and whether the moving party was entitled to judgment as a matter of law. *Jones v. Union Pac. R.R.*, 968 F.2d 937, 940 (9th Cir.1992); *IBEW, Local 47 v. Southern Cal. Edison Co.*, 880 F.2d 104, 105–06 (9th Cir. 1989); *Heiniger v. City of Phoenix*, 625 F.2d 842, 843 (9th Cir.1980).

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■ The Supreme Court's 1986 "trilogy" of *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson*

---

**3.** The record reflects that Golden Age arranges for transportation of the fish product to Japan, and arranges and pays for cargo insurance. Golden Age monitors sales activity, prices and inventory through the regular review of inventory and sales reports, sales auctions, and market literature, and through visits to its customers in Japan. Golden Age also investigates and files claims for fish product damaged during transport. When quality claims are submitted by Japanese customers, Golden Age investigates the claims, sometimes necessitating travel to Japan to inspect the product at issue. Finally, Golden Age allegedly compensates customers for legitimate product claims.

*v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), requires that a party seeking summary judgment identify those parts of the record that indicate the absence of a genuine issue of material fact. Once the moving party has made this showing, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356 (footnote omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

**B.**

■ We acknowledge that the courts traditionally have protected seamen as unsophisticated parties in a bargain. *Castillo v. Spiliada Maritime Corp.,* 937 F.2d 240, 247 (5th Cir.1991). The fact that seamen are entitled to special protection by the court, however, does not serve to invalidate an unambiguous clause in their contract. *The Joseph B. Thomas,* 148 F. 762, 764 (3d Cir. 1906).

Brinson was well-educated and experienced with both the fishing industry in general and the practices of Golden Age in particular, having worked on a salmon boat in Alaska and on a shrimp trawler in Australia as well as having worked for three years on other boats managed by Golden Age. During all three years that Brinson worked for Golden Age, the terms of her employment were governed by written employment contracts that she signed with the Vessel owners.

Further, Brinson gave serious attention to the terms of her Contract before she signed it. Brinson signed the Contract in question at the Golden Age offices in Seattle, during a one-on-one meeting with a member of the Golden Age personnel department. Brinson testified in her deposition that she read the Contract prior to signing it, that she understood that she would be paid a guaranteed daily wage, with the potential for a bonus based on a share of the Vessel's catch, that she asked for and received a copy of the Contract, and that she had the opportunity to ask specific questions regarding the Contract.

■ Given Brinson's background and answers at her deposition, it is clear that she possessed sufficient education and experience to read and understand the Contract she signed. Brinson does not fall under the liberal protection generally given to seamen by the courts.

We next consider whether Brinson's claims are barred by the language of the Contract. The express language of the Contract provides that the owner may estimate the value of the fish product produced by the Vessel by whatever method it shall select, in its sole discretion. By signing the Contract, appellees claim Brinson "expressly recognized and acknowledged" both that the estimate of the fish value would never be identical to the actual sales price, and that the actual sales price might differ substantially from the owner's estimates. The explicit terms of the Contract state that appellees' estimate of their expenses is made at their sole discretion and is binding on the parties.

Brinson points to the clause in the Contract that addresses the deduction of a "sales commission" from the product value. She argues that for sales to Japan, Kyokuyo was the exclusive sales agent for appellees. According to Brinson, the term "sales commission" means that her employer could withhold the expense paid to a third party to sell the product, and nothing else.

■ Under Washington law, the role of the court in a contract action "is to ascertain the parties' intentions and give effect to their intentions." This court in interpreting contracts has also focused upon the intentions and expectations of the parties at the time of contracting. The controlling intent of the parties must be ascertained from reading the contract as a whole, and

where the language used is unambiguous, no ambiguity will be read into the contract. If the contract language is ambiguous, it must be strictly construed against the [drafter]....

*Taylor–Edwards Warehouse & Transfer Co. v. Burlington N., Inc.,* 715 F.2d 1330, 1334 (9th Cir.1983) (citations omitted). Looking at the Contract as whole, the language is clear. The "Adjusted Product Value" is determined by subtracting certain "expenses" from the owner's estimate of the sales price of the fish. The Contract clearly states that the owner may estimate the expenses "by whatever method it shall select in its sole discretion." Thus, in its sole discretion, the owners of the *Linda Rose* may determine that Golden Age acted as a sales agent in its sales to Japan and is entitled to a commission. Because Brinson's claims rely on her allegation that the appellees breached the Contract by basing her bonus compensation on inaccurate estimates of the value of the fish product, all of her claims are barred by the express language in the Contract. Brinson did not show that the duties performed by Golden Age were not sales functions.

### C.

Brinson argues that the Contract contained an implied duty of good faith, and that by failing to estimate the future yen exchange in good faith, appellees deprived her of the full benefit of the Contract. She claims appellees cannot have had a reasonable belief that their use of inaccurate yen to dollar exchange rates would result in an accurate estimate of the future sales price of the product.

The purchase of foreign exchange rate forward contracts does not breach the duty of good faith, and its practice of periodically purchasing foreign exchange rate contracts allows Golden Age to protect against potential losses due to fluctuations in the exchange rate. Golden Age converts the estimate of product value from yen to dollars using an exchange rate that reflects the actual cost to Golden Age of purchasing the dollars at issue.

■ The Contract sets forth the parties' agreed-upon standard of performance and is completely silent as to the method to be used by Golden Age in converting the "Adjusted Product Value" from yen to dollars. The Contract also does not specify any particular point in time at which Golden Age is to make that conversion and does not require that Golden Age use the spot rate at some arbitrary and unidentified point in time. Instead, the Contract leaves the estimate of the product value, and, thus, any exchange rate calculations made as part of that estimate, up to the owner. The Contract makes clear that estimates of the sales price may differ substantially from actual sales price and may never be identical. To require use of the spot market exchange rate in figuring Brinson's bonus wages effectively would be to add a term to the Contract. Golden Age's business practices are a valid exercise of the appellees' discretion under the Contract. Once the appellees in this case assert that the record indicates there is no genuine issue of material fact, the burden shifts back to Brinson to designate "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). Brinson has not met this burden. Brinson placed no evidence before the district court that the appellees' practices of purchasing futures contracts and paying sales commissions to two entities were in bad faith or were not standard practices in the fishing industry. Neither has Brinson produced any evidence that appellees used conversion rates that were always in their favor.

■ Rule 8(f) of the Federal Rules of Civil Procedure requires a liberal reading of complaints. When a motion for summary judgment is made, the adverse party may not rest upon mere allegations of denials of pleadings, but response must set forth specific facts showing that there is a genuine issue for trial. *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1163 (5th Cir.1983). Under Rule 56(e), an adverse party to a motion for summary judgment must allege specific facts supported by affidavit that raise genuine issues for trial. Thus, Brinson "may not rest upon the mere allegations or denials of [her] pleading." Fed.R.Civ.P. 56(e).

### D.

■ In the alternative, Brinson argues that the district court's decision should be

reversed on the ground that under Washington law, Brinson's wages were wilfully withheld.[4] By their own terms, sections 49.52.050(2) and 49.52.070 of the Revised Code of Washington apply only where the nonpayment of wages is conducted "wilfully and with intent to deprive the employee of any part of his wages." Wash.Rev.Code § 49.52.050(2) (1990). Therefore, the nonpayment must be the result of knowing and intentional action by the employer, rather than of a bona fide dispute as to the obligation of payment. Dismissal of such claims on summary judgment is permitted when there is no evidence that the employer acted wilfully. Although Brinson makes a number of "conclusory" statements regarding appellees' allegedly wilful behavior, she presents no evidence that appellees wilfully set about to deprive her of her wages.

### III.

The court must view the evidence in the light most favorable to Brinson, and draw all reasonable inferences in her favor. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Viewing the evidence in the light most favorable to Brinson, it is clear that appellees met their burden under Rule 56(c) of showing there is no genuine issue of material fact. Brinson must do more than show that there is some "metaphysical doubt as to material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Brinson does not meet this burden. She produces no persuasive evidence to refute the unambiguous words of the Contract. The court finds that the evidence shown by Brinson is merely colorable and not significantly probative. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Therefore, the district court did not err in granting summary judgment for appellees.

4. Brinson's first state law claim involves section 49.52.050(2) of the Revised Code of Washington, which provides:

> Any employer or officer, vice principal or agent of any employer, ... who

> . . . . .

> (2) Wilfully and with intent to deprive the employee of any part of his wages, shall pay

The holding of the district court is AFFIRMED.

any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract ...
Shall be guilty of a misdemeanor.
Wash.Rev.Code § 49.52.050(2) (1990).
Section 49.52.070 gives an employee a civil action in which the employee is entitled to double damages for a violation of the above provision.
Wash.Rev.Code § 49.52.070 (1990).